BRADLEY MANUF'G CO. (DORSEY REVOLVING HARVESTER RAKE CO. v.). See Case No. 4,015.

---

## Case No. 1,789.

BRADLY v. MARINE & R. PHOSPHATE MIN. & MANUF'G CO. OF SOUTH CAROLINA et al.

[3 Hughes, 26.][1]

Circuit Court, D. South Carolina. April Term, 1879.[2]

CORPORATIONS—OFFICERS AND AGENTS—PURCHASE OF INDEBTEDNESS OF BY PRESIDENT—CONTRACTS BETWEEN CORPORATION AND OFFICER — RECEIVERS—POWERS — QUESTIONING VALIDITY OF ACT COLLATERALLY—NEGOTIABLE INSTRUMENTS—NEGOTIABILITY—FEDERAL COURTS—JURISDICTION—ASSIGNEE OF NEGOTIABLE INSTRUMENT.

1. The president of a corporation may with his own means (the company being embarrassed and without funds to do so) purchase the past due outstanding bond of the company, and hold the same as against the company. Otherwise if he purchase with the funds or credit of the company.

[See Combination Trust Co. v. Weed, 2 Fed. 24.]

[See note at end of case.]

2. A corporation may make a valid contract with its president, renewing, extending, and increasing the rate of interest upon its own past due bond, held by him, the contract being a fair and equitable one.

[See Combination Trust Co. v. Weed, 2 Fed. 24.]

[See note at end of case.]

3. The validity of a receiver's act in selling or exchanging the property in his possession as such receiver will not be questioned in a collateral suit in another court. The court whose officer he is, having approved his accounts, discharged him, and cancelled his bond, must be assumed to have authorized as well as approved the sale.

[See note at end of case.]

4. The bond in this suit, though originally given by one citizen of the state of South

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] [Affirmed in Marine, etc., Phosphate M. & M. Co. v. Bradley, 105 U. S. 175.]

Carolina to another, after the renewal agreement of May 13th, 1874, became commercial paper, and the same passed from hand to hand by delivery; and having passed into the hands of the plaintiff, a citizen of Massachusetts, he may maintain suit thereon in this court. It does not fall within the prohibition of the 11th section of the judiciary act of 1789 [1 Stat. 78].

[See White v. Vermont & M. R. Co., Case No. 17,559, 21 How. (62 U. S.) 577.]

[See note at end of case.]

[In equity. Bill by William L. Bradly against the Phosphate Company, George W. Williams & Co., Pelzer, Rogers & Co., and others. Decree for complainant.]

On the 28th day of December, 1872, the Marine and River Phosphate Mining and Manufacturing Company of South Carolina, one of the defendants, obtained from William J. Gayer, receiver of the bank of the state, a loan of twenty thousand dollars, and to secure the payment thereof, executed the following bond: "State of South Carolina, Charleston County. Know all men by these presents, that we, the Marine and River Phosphate Mining and Manufacturing Company of South Carolina, are held and firmly bound unto William J. Gayer, receiver, in the sum of twenty thousand dollars, with interest thereon, at the rate of ten per cent. annually, payable semi-annually, to be paid on the first day of July next ensuing the date hereof, for which payment well and truly to be made, we, the said company, do hereby bind ourselves and our successors firmly by these presents. In witness whereof the said company have caused their seal to be hereto affixed the 28th day of December, A. D. 1872. We, the said company, do further covenant and agree that the above bond constitutes a lien upon the property of said company, and that the same is issued under and pursuant to the provisions of section thirty-nine of chapter sixty-four of the General Statutes." This bond was not paid at maturity, but lay along without renewal, the company paying the interest, until April 2d, 1874, when C. C. Puffer, receiver, (successor to William J. Gayer, receiver), sold and delivered said bond to one A. J. Coe, who purchased the same at the instance and with the means ($30,000 of the capital stock of said Marine and River Phosphate Mining and Manufacturing Company) of D. T. Corbin, then president of the Marine and River Phosphate Mining and Manufacturing Company of South Carolina. The receiver indorsed said bond as follows: "In consideration of the sum of twenty thousand dollars to me in hand paid, and by order of Judge Graham, I hereby assign this bond to bearer." Coe delivered said bond to Corbin, president of the defendant company, who informed the company that further time for payment of said bond would be given on condition that the interest be advanced to the rate of twelve per cent. per annum, payable quarterly. The proposition was submitted to the board of directors of the company, who agreed to

said proposition, and directed that the following be written upon said bond, which was accordingly done, and the signature of the president and treasurer with the seal of the company attached, to wit: "In consideration of further forbearance on the part of the holder of this bond till the first day of January, A. D. 1875, the Marine and River Phosphate Mining and Manufacturing Company of South Carolina hereby promise, waiving all set-off or other defence, to pay this bond to bearer on the first day of January, A. D. 1875, with interest at the rate of twelve per cent. per annum, from the first day of April, A. D. 1874, payable quarterly; and should said bond not be paid on the first day of January next, then thereafter interest shall be paid in the same manner and at the same rate as herein mentioned till paid."

The other defendants named are sued as stockholders, who are jointly and severally liable under the general incorporation act of South Carolina, under which the defendant company was organized, for the debts of the company contracted before the full amount of the capital stock is paid in. This section 22 of the statute is as follows: "The members of every company shall be jointly and severally liable for all debts and contracts made by the company until the whole amount of capital stock, fixed and limited by the company in manner aforesaid, is paid in, and a certificate thereof made and recorded as prescribed in the following section."

Section 36 of said act, relative to the collection of an execution against the company and stockholders, is as follows: "When the stockholders of such a company are liable to pay the debts of such company, or any part thereof, their property may be taken therefor on an order of attachment, or on execution issued against the company for such debt, in the same manner as an order of attachment and execution issued against them for their individual debts."

BOND, Circuit Judge. This cause came on to be heard upon the pleading, and the testimony taken and reported by James E. Hagood, special master. The substantial facts in the cause seem to be that the defendant company is a corporation under the laws of the state of South Carolina, was organized under the act entitled "An act to regulate the formation of corporations," approved December 10th, 1869, which act was subsequently amended by act of March 9th, 1871. These acts were subsequently embodied in the General Statutes of South Carolina, in chapter 64, commencing on page 357. The capital stock of this corporation was fixed and limited at five hundred thousand dollars, and the same divided into five thousand shares, of one hundred dollars each. There has been paid in of said capital stock but two hundred and fifty thousand dollars, or fifty dollars per share. It is admitted that at the date of the filing of the bill in

this cause, Louis D. Mowry was the owner and holder of seventy-five shares of said capital stock in said company; that F. J. Pelzer, F. S. Rogers, Wesley G. Muckenfuss, and Thomas S. Inglesby, constituting the firm of Pelzer, Rogers & Co., were the owners and holders of one hundred and seventy-six shares of said capital stock in said company, and that George W. Williams, William Birnie, Joseph R. Robertson, James Bridge, Jr., Frank E. Taylor, and Robert S. Cathcart, constituting the firm of George W. Williams & Co., were the owners of one hundred and twenty-eight shares of said capital stock in said company. These persons named were made, with the said company, defendants in this action, have answered, and are now before the court.

The cause of action in this case grows out of the unpaid portion of a bond, executed by the defendant company on the 28th day of December, 1872, in the sum of twenty thousand dollars, to William J. Gayer, receiver. This bond, it appears, was given for ($20,000) money loaned by said Gayer to the said company. Said bond was payable on the 1st day of July following the date thereof, with interest at the rate of ten per cent. per annum. In said bond is the following covenant: "We, the said company, do further covenant and agree that the above bond constitutes a lien upon the property of said company, and that the same is issued under and pursuant to the provisions of section 39 of chapter 64 of the General Statutes." The said bond was duly recorded in the office of the register of mesne conveyances for Charleston county, South Carolina, on the 3d day of January, A. D. 1873. Said bond was not any portion of it paid at maturity by said Marine and River Phosphate Mining and Manufacturing Company of South Carolina, but was allowed to lie along without change or renewal (the said company paying the interest thereon) until some time in March, 1874, when C. C. Puffer, receiver, successor of William J. Gayer, receiver, demanded payment of said bond. At the time of said demand for payment of said bond, said company was in some financial embarrassment, and was not in possession of funds to pay the same. In consequence of this embarrassment, D. T. Corbin, who was then president of the company, induced one A. J. Coe to enter into negotiation with said C. C. Puffer, receiver, with the view to purchase said bond, he, said Corbin, furnishing said Coe, from his own private property, the means (three hundred shares, or $30,000 of the capital stock of said company) to effect such purchase. The bond was purchased by Coe from C. C. Puffer, receiver, and the same was delivered to him. This sale and delivery of said bond was effected about the middle of April, 1874. Soon after its purchase said A. J. Coe assigned and delivered said bond to said D. T. Corbin, in consideration of the thirty thousand dollars of stock

advanced by him to said Coe to purchase said bond. After said bond thus came into the possession of D. T. Corbin, he informed the board of directors of said company that the company could have further indulgence in the payment of said bond if they would renew the same, and pay the regular bank rates of interest thereon, twelve per cent. per annum, and pay the same quarterly. Thereupon the board of directors, on the 13th day of May, 1874, directed the following indorsement to be written upon said bond, to wit: "In consideration of further forbearance on the part of the holder of this bond, till the 1st day of January, A. D. 1875, the Marine and River Phosphate Mining and Manufacturing Company of South Carolina hereby promises, waiving all set-off, or other defence, to pay this bond to bearer on the 1st day of January, A. D. 1875, with interest at the rate of twelve per cent. per annum, from the 1st day of April, A. D. 1874, payable quarterly; and should said bond not be paid on the 1st day of January next, then thereafter interest shall be paid in the same manner and at the same rate as herein mentioned, till paid." The said bond continued in the possession of D. T. Corbin from this time forward till June, 1877, when he sold and delivered the same to the complainant, William L. Bradly, of Boston, Massachusetts. Up to January 1st, 1877, said D. T. Corbin collected and received the interest as it fell due on said bond under the renewal agreement of May 13th, 1874; and in December, 1876, he collected and received from the company ten thousand dollars in money, on account of the principal due on said bond. It thus appears that there is due and unpaid upon said bond the sum of ten thousand dollars, with interest thereon at the rate of twelve per cent. per annum, payable quarterly, from the 1st day of January, A. D. 1877.

The defence to this action made by the defendant company is, first, that said bond was "paid" by the $30,000 in stock of said company, which said C. C. Puffer received therefor from A. J. Coe. As to this defence, it is sufficient to say, that there is no evidence that shows that said purchase of said bond by A. J. Coe was intended as a payment thereof. That none of the parties to this transaction—Puffer, Coe, or Corbin—so understood it, but the very reverse; and further, the consideration paid, although it was $30,000 of the capital stock of said company, was not the property of the company, but the private property of D. T. Corbin. It is not pretended that the company paid or furnished the means to pay said bond at the time C. C. Puffer parted with the same to A. J. Coe, in April, 1874; and the only basis for the claim of payment is the entry made in the final accounts of C. C. Puffer, receiver, made to the court of common pleas for Charleston county, in which it appears that this bond is accounted for as "paid" by the

transfer to him of three hundred shares of stock in the Marine and River Phosphate Mining and Manufacturing Company of South Carolina. That this entry is not technically correct is shown by the admitted fact that the company furnished no means to pay the bond then, and neither did Corbin or Coe purchase on behalf of the company. This entry is explained by Mr. Puffer as his method of recording the transaction, and it meant, so far as the fund in his hand as receiver was concerned, that the bond was exchanged for said $30,000 of stock. But it may be further remarked, that neither Corbin or Coe, as far as appears, was a party to the said entry in Puffer's account as receiver, and that entry, hence, does not conclude them. There is, therefore, no ground for asserting that said bond was or has been paid by or for the defendant company.

A further defence is made that D. T. Corbin was, at the time of the purchase of said bond from C. C. Puffer, the president of the defendant company, and as such president he was incapacitated to speculate in the paper of the company, and so forth; and all benefit and advantage arising from said purchase of said bond by him inured to the benefit of the company, and so forth. This defence set up, if sound in principle, which it is not, does not appear to have sufficient basis of fact to rest upon. It is not alleged in the pleadings or proved by the evidence of the defendants that D. T. Corbin paid less than twenty thousand dollars in value for said bond, and hence there is no ground for saying he speculated in the sense of making profit out of the paper of the company. So far as appears, he paid a full price for the bond; and it still further appears that he entered into the transaction to protect the credit of the company, and to save it from embarrassment, because the company was not in funds at the time to pay the bond. If D. T. Corbin, as the president and agent of the company, had purchased said bond with the funds or credit of the company, said transaction would now be held to have been made for the benefit of the company, without doubt, and the company would be entitled to any benefit or advantage, if any, accruing therefrom. But as the transaction was made with his own means, and because the company had no means with which to make it, the bond became his own private property just as much as the private property was his that he exchanged for it. There was nothing in his position, as president, that forbade the purchase of this bond if he chose to make it.

But it is further said, that the renewal indorsement put upon the said bond by order of the board of directors, on May 13th, 1874, was null and void, because said board was not aware at the time that said D. T. Corbin was the holder of said bond, and the same was in fraud of the rights of stockholders. As to this defence it may be again said it

has no sufficient basis of fact to stand on. In the renewal of said bond in the form that it was done, the board of directors obtained an indulgence in the postponement of the day of payment from D. T. Corbin precisely as they would have done from anybody else not connected with the company. It is not shown that there was any fraud on his part, or that any wrong was done by him to the company or stockholders. So far as said indorsement is concerned, it was evidently more to the advantage of the company than it was to Corbin. What did they receive by it? Six months and a half delay in the payment of their bond, which was then nearly two years past due. What did they give for that indulgence? They increased the rate of interest on said bond two per cent.,—that is, promised to pay the then current bank rate of interest. They simply agreed to pay Corbin for his money what they would have been compelled to pay anybody else, or just what anybody else would have paid him. It is impossible to maintain that such a transaction was a fraud upon the company or its stockholders. As to the facts alleged that the directors of the company did not know at the time they made the indorsement of May 13th, 1874, upon the bond, that D. T. Corbin, their president, actually owned and held the bond, it is disputed. Mr. Reuben Tomlinson, then treasurer of the company, says they did know it. That he knew all about it, and so did most if not all the directors; that he conversed with them about it, and that it was regarded as extremely fortunate for the company that the bond had fallen into friendly hands, and so forth. It seems to me quite immaterial how the fact is, and quite as favorable to the plaintiff if the directors did not know that Corbin held the bond as it would be if they did know it. If they did not know it then it must be assumed that they were not influenced by the fact in taking the action that they did, that they acted impartially and as if dealing with a stranger—just as they should have acted.

As to the validity of the new contract of May 13th, 1874, renewing and extending said bond, there is no ground for questioning it. It was a bona fide transaction, made by the board of directors of the company with D. T. Corbin, then a director and president, by which the company got further time for payment upon their valid outstanding past due bond. The bond being past due, Corbin was entitled to have the same paid at once. The extension of the bond, therefore, by him may be regarded as a loan to the company. That any officer of a corporation may make a valid loan to it there is no doubt. Something has been said about a want of authority in C. C. Puffer, receiver, to sell and transfer said bond. This authority, if he had any, was derived from the court of common pleas for Charleston county, whose officer he was. If there was no authority to make the sale, then that court should deal with the receiver and his bondsmen. But it appears that the sale and transfer of said bond has been approved by the court of common pleas for Charleston county, and Mr. Puffer, as receiver, and his bond, have been discharged. This court must, therefore, assume under the circumstances that Receiver Puffer had ample authority to make the sale and transfer of said bond. His authority cannot now be questioned in this collateral action in this court. The plea to the jurisdiction interposed in this cause by special permission after the defendants had answered, and the case was at issue, is overruled. By the terms of the indorsement of May 13th, 1874, put upon the bond by the defendant company, the said bond became commercial paper, and the same passed from hand to hand by delivery. It does not, therefore, fall within the prohibition of the 11th section of the judiciary act of 1789. The authorities upon this point are ample, and it is unnecessary to discuss them.

The result is, that the plaintiff is entitled to a decree against the defendant company in the sum of ten thousand dollars, with interest thereon at the rate of twelve per cent. per annum, payable quarterly, from January 1st, 1877, to the present time. The defendants named as stockholders are, by the charter of the company, jointly and severally liable for the said sum, and the execution decreed against the company may, by the terms of the charter, be levied upon their property or the property of either of them. The plaintiff is also entitled to have the lien of the bond upon the property of the company foreclosed, and the property sold to pay and satisfy the sum now found to be due. A decree will be entered in accordance with this opinion.

[NOTE. Affirmed by the supreme court, on the grounds, that the endorsement on the bond was in effect a negotiable note, notwithstanding that the bond itself was sealed; that, being such a negotiable instrument, it was excepted out of the prohibition of Act March 3, 1875, § 1; and upon the further grounds, as stated by Mr. Justice Matthews, that the title of the plaintiff below to the bond sued on could not be assailed for want of authority in the receiver to transfer it, even if such a defense was open to the obligors, for it sufficiently appeared that the transaction, if not previously authorized, was subsequently confirmed by the court. Nor did the relation between Mr. Corbin and the company at the time of the transaction furnish any defense either at law or in equity. The relation, undoubtedly, was one of a confidential and fiduciary character, but there seems to be no ground in the evidence to challenge the good faith with which the business was conducted. The bond of the company was purchased from the receiver with his own means, and not those of the company. The value paid, so far as the testimony discloses, was full; and every step, when taken, was made known and assented to by the directors of the corporation. The transaction was legitimate in itself, and beneficial to the company, and the dealing was not by the president with himself, but with the corporation in fact, represented and acting by other directors, with full knowledge of all the facts. The defense of payment was suggested by the cir-

cumstance that the receiver, after parting with the bond in exchange for the stock, reported it as paid in that way. So far as the fund in his hands was concerned, it might be so treated; but the company and its stockholders must be conscious that they have no right so to consider it. Marine, etc., Phosphate M. & M. Co. v. Bradley, 105 U. S. 175.]